The **ALABAMA GREAT SOUTHERN RAILROAD COMPANY** et al., Plaintiffs,

v.

**UNITED STATES** of America and Interstate Commerce Commission, Defendants.

Civ. A. No. 8945.

United States District Court
N. D. Alabama, S. D.

June 2, 1958.

Jos. F. Johnston and Thad Holt, Jr. (of Cabaniss & Johnston), Birmingham, Ala., for plaintiffs.

Victor R. Hansen, Asst. Atty. Gen., James E. Kilday and Willard R. Memler, Attys., Dept. of Justice, Washington, D. C., and W. L. Longshore, U. S. Atty., Birmingham, Ala., for the U. S.

Robert W. Ginnane, General Counsel, and I. K. Hay, Associate General Counsel, Washington, D. C., for the Interstate Commerce Commission.

Moultrie Hitt, Washington, D. C., and Cooper, Mitch & Black, Birmingham, Ala., represented TAG Ry. Co.

Clarence Raymond, Louisville, Ky., and Walter C. Scott, Jr., Savannah, Ga., James A. Simpson and Sadler & Sadler, Birmingham, Ala., for Louisville & N. R. Co. and Central of Georgia Ry. Co.

Robert H. Hall, Asst. Atty. Gen. of Georgia, for the Public Service Commission of Georgia.

Strang, Fletcher, Carriger & Walker, Chattanooga, Tenn., for the Chattanooga Chamber of Commerce.

W. J. Hickey, Washington, D. C., for the American Short Line R. R. Ass'n.

Before RIVES, Circuit Judge, and LYNNE and GROOMS, District Judges.

GROOMS, District Judge.

This is an action instituted under the provisions of Sections 1336, 1398, 2284, and 2321–2325 of Title 28, Section 1009 of Title 5, and Section 17(9) of Title 49, United States Code, to enjoin, annul and

set aside the report and order of the Interstate Commerce Commission, Division 2, in Investigation and Suspension Docket No. 6413, Cancellation of Routing—Tennessee, Alabama and Georgia Railway Company, and Southern Railway Company, decided May 2, 1957, and the order of the entire Commission in the same cause dated August 23, 1957. The report and orders required the cancellation of certain schedules filed with the Commission wherein the Southern Railway Company and its system lines [1] propose to eliminate through routes when the Tennessee, Alabama & Georgia Railway Company [2] is an intermediate carrier in connection with their lines, whether combination or joint rates apply, and also to eliminate the TAG as an intermediate carrier on through traffic with other railroads where the plaintiffs receive a haul beyond either Chattanooga or Gadsden.

The Commission ruled that the proponents, plaintiffs here, had not sustained the burden of proving that the proposed routing restrictions would be consistent with the public interest, and held that the proposed schedules were not shown to be just and reasonable.

TAG, C. of Ga., L. & N., Georgia Public Service Commission, Chattanooga Chamber of Commerce, and the American Short Line Railroad Association, have intervened herein in opposition to the relief sought.

The line of TAG extends from Chattanooga, Tennessee, in a southerly direction to Gadsden, Alabama, 91.7 miles. This line parallels the segment of the line of plaintiff, A. G. S., extending from Chattanooga to Attalla, Alabama, 89.7 miles. The Lookout Mountain Range separates these lines, the former lying east and the latter west of the Range. No local cross-country competition exists between these carriers, but they compete for traffic moving between points beyond Chattanooga, on the one hand, and Gadsden, on the other, where the TAG is intermediate. A branch of the A. G. S. extends from Attalla to Gadsden 5.5 miles. In addition to its interchange connections at Gadsden with the A. G. S., TAG maintains connections at that point with the L. & N. and the N. C. & St. L. In addition to the Southern, it connects also with the C. of Ga. and with the N. C. & St. L. at Chattanooga.

In 1954, the freight revenue of TAG was $1,180,670 and that of Southern, $283,248,911. The rate of return on net investment was 5.41 per cent for TAG and 5.15 per cent for Southern. TAG handled a total of 693,155 tons of freight, of which 94,165 were handled in intermediate service. Moving in connection with the Southern that year were 1,278 carloads aggregating 50,444 tons, which produced revenue to TAG of $75,437.48, or 6.4 per cent of its total revenue. A total of 530 of those carloads aggregating 19,166 tons, which yielded revenues of $35,682.61 could possibly have moved over TAG in intermediate service, over through routes in connection with railroads other than those of plaintiffs. Such routes in most instances, however, are longer, require more interchanges and more time in transit as compared with the plaintiffs' TAG routes.

Additional revenue of $29,749 accrued to TAG in that year on inbound freight charges on shipments of steel from Birmingham to Chattanooga for fabrication and reshipment beyond. Many of the

---

1. The Southern Railway system is composed of the Southern Railway Company; The Alabama Great Southern Railroad Company; The Cincinnati, New Orleans & Texas Pacific Railway Company; The New Orleans & Northeastern Railroad Company; and the Georgia Southern & Florida Railway Company. The subsidiary lines of this system are the Carolina & Northwestern Railway Company; the Chattanooga Traction Company; the New Orleans Terminal Company; and the State University Railroad Company.

2. Herein referred to as TAG. Plaintiff railroads will be referred to as Southern, Alabama Great Southern as A. G. S., Central of Georgia Railway Company as C. of Ga., Louisville & Nashville Railroad Company as L. & N., and Nashville, Chattanooga & St. Louis Railway Company, as N. C. & St. L.

latter shipments are not reshipped from Chattanooga, thus requiring the fabricator to cancel the inbound freight bills thereon for transit purposes. This brings the total TAG intermediate freight revenue in connection with Southern to $105,186.49, or 9.38 per cent of its revenue in 1954. In that year Southern originated only 299 carloads, or 23 per cent, of the total of 1,278 carloads moved over TAG in connection with the routes of the Southern. In the same year, 1,674 carloads were interchanged between the carriers at Chattanooga and Gadsden, of which 1,133, or 68 per cent, were interchanged at Chattanooga, 471 being delivered to TAG and 662 to Southern. The remaining 541 carloads, or 32 per cent, were interchanged at Gadsden, of which 284 were delivered to TAG and 257 to A. G. S.

TAG handled a total of 2,701 carloads of freight in intermediate service. This traffic yielded $145,085, or 12.3 per cent of its total revenues. Of this total, 1,423 carloads yielding $69,842, or 5.9 per cent, were handled in connection with carriers other than Southern.

The average revenue per car on all carload traffic handled by TAG in 1954 was $64.84, as compared to $58.45 on intermediate traffic handled with the Southern. Southern's average revenue per car on this intermediate traffic was $197.65. The average revenue per ton and per ton-mile was greater on traffic which the plaintiffs handled in that year in connection with TAG than all of their traffic.

Based on the 1954 data, a substantial part of which is stated above, the Commission found that if the proposed schedules were permitted to become effective, the minimum loss in freight revenues to TAG would approximate $39,755 yearly, which would have reduced that carrier's rate of return for that year from 5.41 to 4.95 per cent. The maximum loss would approximate $75,437, which would have reduced the rate of return 4.52 per cent.

The losses in freight revenues to the railroad interveners in the years 1953 and 1954 had the proposed restriction been in effect, were estimated by the Commission at $10,467 for the C. of Ga., $126,842 for the L. & N., and $9,176 for the N. C. & St. L.

Southern maintains that it has discharged the burden of proving that the proposed closure is consistent with the public interest as required by Section 15(3) of the Interstate Commerce Act [3] in that it established that the proposed closure would leave shippers with entirely adequate transportation, that the transportation remaining would be more efficient and economical, that cars routed via Southern move much more swiftly than those moved via TAG, that a number of absurdly circuitous routes and expensive and time-consuming foreign-lines interchanges will be eliminated, that the best use of transportation facilities by doing something toward alleviating the pressing car shortage will be promoted, and that, in general, the closure will furnish the shipping public a more prompt, efficient and economical transportation service. So contending, it insists that the Commission's orders are erroneous, arbitrary and capricious.

Those arrayed in opposition assert that the evidence before the Commission established that the shipping public would be adversely affected if the closure is permitted by reason of being deprived of the superior services presently rendered by TAG to the shipping public. They list these superior services as including: "personal service, quoting rates, tracing cars, no restriction of routes, fastest competitive route, use of card system which notifies shippers the approximate time to expect their shipment, fastest service, dependable service, fastest switching service, publication of liberal transit tariffs, better services, only direct route from Gadsden-north, better services on stop-off cars, and weighing of cars."

TAG, C. of Ga., N. C. & St. L, and L. & N., as well as some 35 shippers and public witnesses, intervened and intro-

---

3. 49 U.S.C. § 15(3) also § 15(4).

duced testimony and evidence in a hearing before the Examiner in opposition to the proposed schedules. The record before the Commission consists of 1,043 pages of testimony and 128 exhibits.

The limits of our review are well marked. Where based upon adequate findings, which are supported by substantial evidence, the Commission's orders may not be set aside on review, even though the Court may not agree with the Commission's conclusions. Interstate Commerce Commission v. Union Pacific R. Co., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308. Where there is found to be a rational basis for the conclusions of the Commission, the judicial function is exhausted, and the Court will not substitute its judgment for that of the Commission. Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 54 S.Ct. 692, 78 L.Ed. 1260.

We find no merit in plaintiffs' contention that the Commission's orders violate the due process clause of the Fifth Amendment to the Constitution of the United States; and without digressing to redefine the term "consistent with the public interest," as employed in Section 15(3), or to re-examine the Ogden Gateway Case, 35 I.C.C. 131, in the light of the 1940 Amendment to Section 15(3), other than to state that we concur in the Commission's opinion respecting the same, we conclude that the challenged orders are supported by adequate findings (Alabama Great Southern R. Co. v. United States, 340 U.S. 216, 227–228, 71 S.Ct. 264, 95 L.Ed. 225) and that such findings are supported by substantial evidence; that it cannot be held that the Commission erred in finding that plaintiffs had not sustained the burden of proving that the proposed routing restrictions would be consistent with the public interest, and that it erred in concluding that the proposed schedules were not shown to be just and reasonable.

It is, therefore, considered, ordered and adjudged that the complaint be and the same hereby is dismissed. Costs are taxed against the plaintiffs, for which, unless presently paid, execution may issue.